Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO          Docket No.
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                Plaintiffs,

     -against-

AVONORA INC. d/b/a AVONORA PHARMACY,
IRINA ARONOVA, AVK RX INC., STANLEY
ARONOV, and JOHN DOE DEFENDANTS "1"
THROUGH "10,"

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Avonora, Inc. d/b/a Avonora

Pharmacy, Irina Aronova, AVK Rx Inc., Stanley Aronov, and John Doe Defendants "1" through

"10" (collectively, the "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a massive, on-going fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $2.3 million in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, primarily in the firm of topical Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Lidocaine or Lidothol Patches (collectively, the "Fraudulent Topical Pain Products"), as well certain other medications including oral nonsteroidal anti-inflammatories ("NSAIDs") and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      Defendants Irina Aronova ("I. Aronova") and Stanley Aronov ("S. Aronov") (collectively, the "Pharmacy Owner Defendants"), along with John Doe Defendants "1" – "10", devised an integrated scheme to use two pharmacies, Avonora, Inc. d/b/a Avonora Pharmacy ("Avonora") and AVK Rx, Inc. ("AVK") (collectively, the "Pharmacy Defendants"), to dispense the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

3.       In furtherance of the fraudulent scheme, the Pharmacy Owner Defendants, the Pharmacy Defendants, and John Doe Defendants "1" – "10" (collectively, the "Defendants") entered illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial incentives facilitated through, among other things, Defendants' participation in a large-scale check-cashing and money-laundering operation, Defendants steered

the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the Fraudulent Topical Pain Products to the Pharmacy Defendants.  Many of the prescriptions were forged and/or unauthorized.

4.      To maximize profits, the Defendants intentionally targeted the Fraudulent Topical Pain Products to dispense to Insureds, solely based on the medications' exorbitant pricing and high profit margins, in place of other effective, but much-less costly prescription and non-prescription drug products.  For example, the Pharmacy Defendants submitted more than $600,000.00 in fraudulent billing for Lidothol 4.5-5% Patches, typically billing between $2,626.20 and $2,983.80 per box, even though these patches are classified as "unapproved" drugs by the United States Food and Drug Administration ("FDA"). The Pharmacy Defendants also submitted claims to GEICO seeking between $948.57 and $2,364.00 for a single tube of Diclofenac Sodium Gel 3%, and between $1,045.64 and $2,605.80 for a single tube of Lidocaine 5% Ointment, despite similar over-the counter products being available at a fraction of the cost.

5.      The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health, safety, and well-being.  Among other things, the Pharmacy Defendants dispensed pharmaceutical products never authorized or prescribed by a licensed physician, instead often using forged or unauthorized prescriptions; repeatedly dispensed large quantities of multi-ingredient pain patches that are not FDA-approved; and dispensed large quantities of Fraudulent Pharmaceuticals pursuant to predetermined protocols without tailoring the prescriptions to the individual needs of any patient.

6.      By this action, GEICO seeks to recover more than $568,300.00 that Defendants stole from it, along with a declaration that GEICO is not legally obligated to reimburse Avonora

and AVK for over $1,226,100.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through the Pharmacy Defendants because:

(i)     the Pharmacy Defendants billed for pharmaceutical products that were medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal – and at times, forged – prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants in exchange for unlawful kickbacks and other financial incentives;

(iii)   the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and caused the Pharmacy Defendants to dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)    the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals through the Pharmacy Defendants pursuant to illegal, invalid, duplicitous, and forged prescriptions.

7.      The Defendants' scheme began in 2019 and continues through the present day.  As discussed more fully below, the Defendants at all times have known that: (i) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants in exchange for unlawful kickbacks and other financial incentives; (ii) the Pharmacy Defendants dispensed and billed for pharmaceutical products not approved by the FDA; (iii) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and at the risk of patient health and safety; (iv) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacy Defendants dispense in large

volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous and forged prescriptions and continuing to seek reimbursement on their unpaid fraudulent claims.

8.      Based on the foregoing, the Pharmacy Defendants do not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The charts attached hereto as Exhibits "1" and "2" set forth a sample of the fraudulent claims identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $568,300.00.

**I.      Plaintiffs**

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.      Defendants**

10.      Defendant I. Aronova resides in and is a citizen of New York. I. Aronova is the current owner of record and supervising pharmacist of AVK and the previous owner of record and supervising pharmacist of Avonora.

11.      Defendant S. Aronov resides in and is a citizen of New York.  S. Aronov is the current owner of record of Avonora, but previously served as Avonora's manager/vice president.

S. Aronov also is connected to AVK through public database searches.

12.     Defendant Avonora is a New York corporation, with its principal place of business at 149-01 Union Turnpike, Flushing, New York.  Avonora was incorporated by I. Aronova on or about January 9, 2015.

13.     On or about December 29, 2017, I. Aronova transferred ownership of Avonora to S. Aronov for no or nominal consideration.

14.     Defendant AVK is a New York corporation with its place of business at 3904 Church Avenue, Brooklyn, New York. AVK was incorporated by Gulmira Aronov ("G. Aronov") on May 20, 2016.

15.     On or about December 29, 2017, the same day I. Aronova transferred ownership of Avonora to S. Aronov for no or nominal consideration, G. Aronov transferred ownership of AVK to I. Aronova.  Upon information and belief, G. Aronov transferred ownership of AVK to I. Aronova for no or nominal consideration.

16.     Notably, I. Aronova and AVK were recently sued in the Eastern District based on their involvement in a fraudulent no-fault insurance scheme nearly identical to the scheme alleged herein. See Liberty Mut. Ins. Co. et al. v. AVK Rx Inc., et al., 2:22-cv-07328(GRB)(SIL) (the "Liberty Mutual AVK Case").

17.     John Doe Defendants "1" – "10" reside in and are citizens of New York.  John Doe Defendants "1" – "10" include persons who are presently not identifiable but (i) who are associated with the Pharmacy Owner Defendants and Pharmacy Defendants and who conspired with the them to further the fraudulent scheme committed against GEICO other New York automobile insurers; and (ii) laypersons associated with the No-Fault Clinics and who conspired with the Pharmacy

Owner Defendants and Pharmacy Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.   An Overview of New York's No-Fault Laws

22.     GEICO underwrites automobile insurance in the State of New York.

23.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

25.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

26.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

28.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

29.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.  An Overview of Applicable Licensing Laws

30.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

31.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

32.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

33.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

34.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

35.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

36.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

37.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

38.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

39.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

40.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

42.     Pursuant to New York Education Law § 6808(h), "an applicant for registration as a pharmacy shall be of good moral character."

### III.   The Fraudulent Scheme

43.     Beginning in 2019, and continuing uninterrupted through the present day, the Defendants masterminded and implemented an integrated fraudulent scheme in which they used the Pharmacy Defendants to exploit patients for financial gain by billing GEICO and the New York automobile insurance industry for millions of dollars in exorbitant charges relating to Fraudulent Pharmaceuticals purportedly provided to Insureds.

44.     Avonora and AVK purported to be separate, storefront neighborhood pharmacies operating in Queens and Brooklyn, New York, respectively, but Avonora and AVK operated as part of a large-scale fraud scheme after ownership of each was effectuated through transfers for no or nominal consideration.

45.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, the Pharmacy Defendants' business was largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) – in particular, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Lidothol 4.5-5% Patches – that were prescribed and dispensed without regard for medical necessity or genuine patient care.

46.     The Office of the Inspector General of the U.S. Department of Health and Human Services has noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

47.     In furtherance of the integrated scheme, the Defendants arranged for AVK and Avonora to begin focusing their business on the Fraudulent Topical Pain Products in 2019, each engaging the same two collection attorneys, Leon Kucherovsky, Esq, and Denis Korsunskiy, Esq, to process the Pharmacy Defendants' bills and submit them to New York automobile insurers.

48.     Prior to engaging in the scheme herein beginning in 2019, AVK and Avonora each had been submitting billing to GEICO for a few years without any real focus on the Fraudulent Topical Pain Products.

49.     To that end, AVK did not submit any billing to GEICO for the Fraudulent Topical Pain Products in 2017 or 2018.

50.     By contrast, from 2019 through 2021 AVK billed GEICO nearly $1.4 million for the Fraudulent Topical Pain Products.

51.     In fact, approximately 92% of the billing submitted to GEICO by AVK from 2019 to present is for Fraudulent Topical Pain Products – primarily consisting of topical Lidocaine and topical Diclofenac products.

52.     Similarly, Avonora had been submitting billing to GEICO since 2016 but did not begin to focus its business on the Fraudulent Topical Pain Products until 2019 when it began to participate in the fraud scheme described herein.

53.     From 2016 through 2018, Avonora billed GEICO less than $19,000.00 for topical pain products.

54.     By contrast, between 2019 and 2023, Avonora billed GEICO over $757,000.00 for the Fraudulent Topical Pain Products.

55.     Approximately 93% of the billing submitted to GEICO through Avonora from 2019 to present is for Fraudulent Topical Pain Products – primarily consisting of topical Lidocaine and topical Diclofenac products.

56.     AVK's and Avonora's billing submissions to GEICO each contained a unique form of "Billing Statement", not typical of other pharmacies or other healthcare providers that submitted billing to GEICO.  The Billing Statements submitted by the Defendants were virtually identical in form except for changing the reference to AVK RX PHARMACY or AVONORA PHARMACY.  Moreover, the Billing Statements regularly contained handwritten numbers that appear to have been made by the same individual, indicative of a combined tracking system for claims submitted by the Defendants through AVK and Avonora.  A sample of these Billing Statements are attached at Exhibit "3".

57.     The Defendants' scheme involving the Fraudulent Topical Pain Products was designed to exploit Insureds for financial gain.  The prescriptions for the Fraudulent Topical Pain Products were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, excessive healthcare services, including prescriptions for pharmaceuticals.  Further, the Fraudulent Topical Pain Products themselves often have no proven efficacy beyond what an over-the-counter equivalent can provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

58.     The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses

under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

59.     In keeping with the fact that the Fraudulent Topical Pain Products were not medically necessary but rather prescribed pursuant to predetermined fraudulent protocols and collusive kickback arrangements, many of the charges submitted by the Pharmacy Defendants to GEICO were submitted based on forged or unauthorized prescriptions.

60.     For example, Arkam Rehman, M.D. ("Dr. Rehman"), a physician employed by Apex Medical, PC ("Apex Medical"), stated under oath that his name and license was abused as part of a scheme to dispense medication, tests, and procedures by certain "unknown individuals." Dr. Rehman specifically stated, among other things, that "he did not prescribe or authorize the prescription for any medication, creams, patches, or ointments allegedly provided by AVK." In his affidavit, Dr. Rehman pointed to an electronic prescription for Lidothol 4.5%/5% patches as a representative example of the prescriptions under his name dispensed by AVK that were fraudulent and not authorized by him.

61.     Other Prescribing Providers who purportedly issued prescriptions that were dispensed by the Pharmacy Defendants were associated with Metro Pain Specialists P.C. ("Metro Pain"), including Hong Sik Pak M.D. ("Dr. Pak") and Michael Alleyne, MD. ("Dr. Alleyne"). The use of Dr. Pak's and Dr. Alleyne's names and their association with Metro Pain raises serious concerns regarding the validity and medical necessity of the prescriptions dispensed by AVK and Avonora as Metro Pain has been named as a defendant in multiple affirmative fraud cases involving fraudulent services billed to No-Fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586-DG-RER (E.D.N.Y. 10/7/2021).

62.     Dr. Alleyne himself has stated under oath that, in connection with his work for Metro Pain: (i) he was required to prescribe Fraudulent Topical Pain Products as a condition of his employment; and (ii) prescriptions purportedly issued by him during his time working for Metro Pain were forged and/or altered without his knowledge to include the prescription of additional Fraudulent Topical Pain Products which he did not authorize.

63.     The validity of Dr. Pak's prescriptions are also in question, as he has been named as a defendant in the Liberty Mutual AVK Case, supra, in which it is alleged that Dr. Pak steered prescriptions to AVK pursuant to an illegal collusive agreement with AVK and I. Aronova. See Liberty Mut. Ins. Co. et al. v. AVK Rx Inc., et al., 2:22-cv-07328(GRB)(SIL).  Dr. Pak has a history of professional misconduct, including discipline from the New Jersey State Board of Medical Examiners.

64.     Further, another doctor, William Elton, M.D. ("Dr. Elton"), who worked at Metro Pain like Dr. Alleyne and Dr. Pak, has stated under oath that prescriptions for pain creams under his name were forged.  Dr. Elton worked at Metro Pain from approximately 2018 through December 2020 and stated that he resigned from Metro Pain after discovering it was issuing prescriptions for pain creams under his name without his knowledge or authority.

65.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers and steered them to prescribe and direct large volumes of prescriptions to the Pharmacy Defendants for the targeted set of Fraudulent Topical Pain Products and the other Fraudulent Pharmaceuticals, under the guise of treating the patients at various No-Fault Clinics with which the Prescribing Providers and Clinic Controllers are associated.

66.     Specifically, the Defendants paid unlawful kickbacks or provided other incentives to the Prescribing Providers and Clinic Controllers, and, in exchange, the Prescribing Providers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products) and routed those prescriptions to the AVK and Avonora.  This permitted the Defendants to submit egregious claims for reimbursement for the Fraudulent Topical Pain Products to GEICO through the Pharmacy Defendants.

67.     In keeping with the fact that Defendants participated in illegal, collusive arrangements involving kickback payments, the Defendants generated huge sums of cash associated with AVK and Avonora through participation in a large-scale check-cashing and money-laundering operation, involving tens of millions of dollars of checks illegally exchanged for cash.  As evidenced by Transaction Inquiry Reports produced by a check-cashing facility in Carteret, New Jersey, in 2021 and 2022 more than one hundred checks payable to AVK and Avonora were exchanged for cash, in varying amounts, totaling more than $1 million.

68.     The checks payable to AVK and Avonora, some of which were cashed on the same day, were repeatedly cashed by the same two individuals, Alla Kuratova ("Kuratova") and Artur Piran ("Piran"), both of whom reportedly reside on the same street, Ocean Parkway, in Brooklyn.

69.     Kuratova, who exchanged for cash more than $35 million in checks payable to hundreds of persons/healthcare entities in addition to AVK and Avonora, was deposed in another no-fault insurance fraud action.  See Government Employees Ins. Co., et al. v. Zilberman, et al., Docket No. 1:20-cv-00209(FB)(RML), Docket No. 71.  When questioned at deposition, "[w]ere these checks exchanged for cash to funnel money to unlicensed individuals that controlled medical clinics?", Kuratova invoked the fifth amendment.  Kuratova also was previously indicted for

recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.   See e.g., https://www.dea.gov/press-releases/2013/07/17/rx-trafficking-ring-controlled-brooklyn-medical-practices-nearly-34

70.     In keeping with the fact that Defendants participated in illegal, collusive arrangements and generated prescriptions that were forged or unauthorized, the manager of AVK was Felix Vasserman a/k/a Weisman ("Vasserman"). Upon information and belief Vasserman was also the manager of a multidisciplinary clinic located next door to AVK at 3910 Church Avenue, Brooklyn, New York (the "Church Avenue Clinic"). Many of the medical providers at the Church Avenue Clinic were named as defendants in a federal RICO action (Government Employees Ins. Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK)) wherein GEICO obtained information from a licensed medical doctor that laypersons controlled the clinic and treatment protocols, directed how prescriptions for pharmaceuticals were dispensed, and fabricated medical records and prescriptions to inflate billing submitted to GEICO.

71.     AVK's landlord is 3902 LLC, which is also the lessor to many healthcare providers operating from the Church Avenue Clinic where Vasserman was previously employed as a manager.  Checks made payable to 3902 LLC and various professional corporations with which it had leases were exchanged for cash at a New Jersey check-cashing facility by Kuratova, who as mentioned above, exchanged for cash more than $35 million in checks payable to hundreds of persons/healthcare entities.

72.     In further keeping with the fact that Defendants participated in illegal, collusive arrangements and generated prescriptions that were forged and/or unauthorized, the No-Fault Clinics and healthcare providers operating therefrom who directed prescriptions to the Pharmacy Defendants have often been the subject of investigations and lawsuits commenced by various New

York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

73.     Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, create and control the patient bases at the clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.

74.     Many of the Prescribing Providers' have a history of professional misconduct, insurance fraud, or criminal activity limiting their opportunity to find legitimate employment or to develop their own legitimate practices – leaving them to work for unlicensed laypersons at the No-Fault Clinics and forced to participate in fraudulent treatment and billing protocols.

75.     For example, multiple Prescribing Providers who steered prescriptions for the Fraudulent Pharmaceuticals to AVK were employed by LR Medical, PLLC ("LR Medical"), a professional corporation that was sued by Allstate Insurance Company for its involvement in a scheme in which they referred patients for medically unnecessary services in exchange for kickbacks. Allstate Ins. Co. et al. v. Michael Chillemi, Jr. et al., 19-cv-3051(ERK)(VMS). Prescribing Providers associated with LR Medical were responsible for 30% of AVK's total billing to GEICO.

76.     Other Prescribing Providers whose names were used to steer prescriptions to the Pharmacy Defendants include: (i) S. Ramachandran Nair, M.D. who pled guilty to, among other things, submitting a false Medicaid claim; was excluded from participating in Medicare and all other federally funded health care programs for five years; and in September 2006 was placed on probation by the New York State Board after being charged with two counts of professional misconduct; (ii) Jean-Pierre Barakat, M.D. who was named as a defendant in multiple no-fault

insurance fraud lawsuits alleging, among other things, that he paid illegal kickbacks in exchange for patient referrals, and provided healthcare services and issued prescriptions pursuant to a pre-determined treatment protocol. See Government Employees Ins. Co., et al., v. Barakat, M.D., et al., 17-cv-01066 (E.D.N.Y.); Allstate Ins. Co. et al v. New Century Pharmacy Inc. et al., 19-cv-05702 (E.D.N.Y.); and Government Employees Ins. Co., et al., v. Direct RX Pharmacy Inc. et al., 19-cv-05876 (E.D.N.Y.); (iii) Michael Jacobi, M.D. who was named as a defendant in two prior no-fault insurance fraud lawsuits, one of which alleged he issued prescriptions for pharmaceutical products in exchange for kickbacks. See Government Employees Ins. Co, et al v. Wellmart, 1:19-cv-04414(KAM)(RLM); Government Employees Ins. Co., et al v. Epione Medical, P.C. et al, 18-cv-03159(SJ)(SJB); and (iv) Mihaela Dajdea, P.A. who similarly was a named defendant, along with Dr. Jacobi, in Wellmart, supra.

77.     Many of the No-Fault Clinics where the prescriptions originated that were steered to the Pharmacy Defendants present themselves to be legitimate healthcare practices. In fact, they are multidisciplinary "medical mills" that house a "revolving door" of numerous purported healthcare providers geared towards exploiting New York's No-Fault insurance system.

78.     For example, GEICO has received billing for purported healthcare services rendered at 1100 Pelham Parkway, Bronx, New York from a "revolving door" of over 120 purportedly different healthcare providers

79.     Additionally, GEICO has received billing for purported healthcare services rendered at 1655 Richmond Avenue, Staten Island, New York from a "revolving door" of over 60 purportedly different healthcare providers.

80.     GEICO also received billing for purported healthcare services rendered at 176 Wilson Avenue, Brooklyn, New York from a "revolving door" of over 60 purportedly different healthcare providers.

81.     As a result of the illegal, collusive agreements between the Defendants, the Prescribing Providers, and the Clinic Controllers, the Prescribing Providers and Clinic Controllers issued or caused prescriptions to be issued for the Fraudulent Pharmaceuticals that, to the extent not forged or unauthorized, were prescribed and dispensed in protocol fashion, without regard for genuine patient care and without regard for similar over-the-counter drugs or other pharmaceutical products that could have been recommended.

82.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and Clinic Controllers at the No-Fault Clinics to provide the Pharmacy Defendants with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols and collusive arrangements, Insureds were virtually never given the option to use a pharmacy of their choosing.

83.     The Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants, regardless of: (i) the distance of the Pharmacy Defendants to the Insureds' individual residences or the No-Fault Clinics where the Insureds were receiving treatment; and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' individual residences and the No-Fault Clinics where they were receiving treatment.

84.     Notably, of the Insureds who purportedly received pharmaceuticals dispensed by Avonora, nearly 45% lived outside of Queens, New York, where the pharmacy is located, with residences scattered throughout Brooklyn, Bronx, Manhattan, Staten Island, and Long Island.

85.     Similarly, of the Insureds who purportedly received pharmaceuticals dispensed by AVK, nearly 56% lived outside of Brooklyn, New York, where the pharmacy is located, with residences scattered throughout Queens, Bronx, Manhattan, Staten Island, and Long Island.

86.     In some instances, the Insureds' individual residences were located in states outside of New York, including in New Jersey and Connecticut.

87.     In many cases, the Pharmacy Defendants either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds by the front desk staff at the various No-Fault Clinics without the Insureds ever seeing the prescriptions or knowing such prescriptions were issued.

88.     But for the Defendants' illegal, collusive financial agreements, the Insureds would not have received pharmaceutical products from a pharmacy located in a county outside of their individual places of residence, bypassing countless other pharmacies located much closer to the patients.

89.     The Prescribing Providers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants, notwithstanding its inconvenient location to the Insureds' individual residences because the prescriptions were being issued pursuant to illegal, collusive agreements between and among the Defendants, the Prescribing Providers, and the Clinic Controllers.

90.     The Defendants masterminded and implemented their pharmaceutical fraud scheme knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the prescriptions for the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from the Pharmacy Defendants to No-

Fault insurers and financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds through the Pharmacy Defendants at exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care or for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

A.   **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care to Exploit Patients for Financial Gain**

91.     In accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, including the same particular unapproved Lidothol patches sourced from the same producer.

92.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacy Defendants – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

93.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an NSAID for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medical

regiment – including the use of muscle relaxants and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

94.     More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain. According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., NSAIDs) should be used as first line therapy in conjunction with other conservative therapies for patients for whom medications are clinically appropriate.

95.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors.  Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom oral medications are contraindicated.  For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

96.     With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs have shown that they are no more effective than a placebo.

97.     Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol that failed to include any individualized treatment whatsoever.

98.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

99.     To the extent any examination was performed at all, the Prescribing Providers: (i) often failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals; and/or (ii) often inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

100.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed and accurate patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed pharmaceutical product.

101.     In keeping with the fact that the Providing Providers' prescriptions of the Fraudulent Pharmaceuticals were based on predetermined protocols, the Prescribing Providers often failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to the patients were actually dispensed to the patients and whether the patients actually used them.

102.    The Prescribing Providers also typically failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals provided any pain relief to the patients or whether the patients experienced any side effects associated with the prescribed pharmaceutical product.

103.    At times, the Prescribing Providers failed to document in their examination reports that the patient even received a Fraudulent Pharmaceutical.

104.    The failure of the Prescribing Providers to properly document which Fraudulent Pharmaceuticals were prescribed to their patients and the patients' reactions to those pharmaceuticals demonstrates a complete disregard for patient health and safety.

   a.    **The Pharmacy Defendants Dispensed Pain Patches Not Approved by the FDA**

105.    In keeping with the fact that Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients, the Pharmacy Defendants billed GEICO hundreds of thousands of dollars for dispensing unapproved drugs produced or packaged by an unregistered supplier.

106.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

107.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

108.    The Pharmacy Defendants, as pharmacies licensed in New York State, are prohibited from holding for sale or selling drugs that are sourced from drug suppliers not licensed

in New York, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

109.    Avonora has billed GEICO more than $391,800.00, and AVK more than $249,500.00, for dispensing purported pharmaceutical pain patches to GEICO Insureds denominated as "Lidothol External Patch 4.5-5 MG".

110.    The FDA considers Lidothol Patches as unapproved drugs.

111.    The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness, or quality. Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

112.    Federal law requires all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing.  Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions when there is no FDA-approved drug to treat that condition. See e.g., https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

113.    The FDA requires every prescription product, whether a brand name or generic drug, to have a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Assignment of an NDC to a particular drug product does not indicate that the FDA has verified the information provided or that the products are FDA approved.

114.    Each NDC for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.

115.    All Lidothol 4.5-5% Patches billed by the Pharmacy Defendants with assigned NDC 53225102501 were purchased or ultimately sourced from Terrain Pharmaceuticals, LLC ("Terrain Pharmaceuticals").

116.    Terrain Pharmaceuticals is not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale.

117.    The Pharmacy Defendants, as noted above, are prohibited from selling drugs that are purchased from drug suppliers not licensed in New York and, therefore, they are prohibited from holding for sale or selling Lidothol 4.5-5% Patches purchased from Terrain Pharmaceuticals.

118.    To the extent that the Pharmacy Defendants somehow circumvented purchasing the Lidothol 4.5-5% Patches directly from an unlicensed supplier, the patches remain as "unapproved" drugs and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

119.    Similarly, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like the Lidothol Patches, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe with no out of the ordinary risk to the patient.

120.    In short, the Pharmacy Defendants obtained prescriptions and dispensed and billed for large volumes of "unapproved" drugs without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and

accurate labelling – solely to exploit the patients for financial gain, without regard for genuine patient care.

### b.  The Pharmacy Defendants Repeatedly Dispensed Fraudulent Pharmaceuticals Based on Forged and Unauthorized Prescriptions

121.  In discussed in detail above, many of the charges by the Pharmacy Defendants to GEICO were submitted based on forged and/or unauthorized prescriptions and at least one physician has stated under oath that prescriptions purportedly issued by him and dispensed by the Pharmacy Defendants were forged.

122.  Furthermore, at times the Pharmacy Defendants submitted electronic prescriptions containing handwritten changes to what was purportedly prescribed by the Prescribing Provider (the "Altered Prescriptions").

123.  At times, the Altered Prescriptions originally prescribed a single ingredient Fraudulent Topical Pain Product (i.e., Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%), but instead the Pharmacy Defendants dispensed and billed for a compounded pain cream with multiple ingredients pursuant to an Altered Prescription.  For example:

(i)  On May 29, 2019, Leonid Reyfman, MD ("Dr. Reyfman") issued an electronic prescription for Diclofenac Sodium Gel 3% to Insured JY.  However, on June 3, 2019, July 19, 2019, and August 16, 2019, AVK dispensed a multi-ingredient compounded pain cream to JY pursuant to an Altered Prescription.

(ii)  On May 31, 2019, Yuliya Paritskaya, PA ("PA Paritskaya") issued an electronic prescription for Diclofenac Sodium Gel 3% to Insured DM.  However, on June 3, 2019, July 18, 2019, and August 16, 2019, AVK dispensed a multi-ingredient compounded pain cream to DM pursuant to an Altered Prescription.

124.  At other times, the Pharmacy Defendants modified the quantity of the Fraudulent Pharmaceuticals to be dispensed or substituted one Fraudulent Topical Pain Product for another. For example:

(i)     On July 24, 2020, PA Paritskaya issued an electronic prescription for Lidocaine 4% Patches to Insured LB. However, on July 27, 2020, AVK dispensed non-FDA approved Lidothol 4.5-5% Patches to LB pursuant to an Altered Prescription.

(ii)    On September 30, 2019, PA Paritskaya issued an electronic prescription for Lidocaine 5% Patches to Insured AM. However, that same day AVK dispensed Lidocaine 5% Ointment to AM pursuant to an Altered Prescription.

(iii)   On July 30, 2020, Andrew Davy, M.D. ("Dr. Davy") issued two separate electronic prescriptions for "cream based cream" to Insured CN. On August 18, 2020, September 18, 2020, and October 23, 2020, AVK dispensed non-FDA approved Lidothol 4.5-5% Patches and Diclofenac Sodium Gel 3% to CN pursuant to Altered Prescriptions.

125.    The Altered Prescriptions often included a note to "verify with md", suggesting the changes were made by the Pharmacy Defendants prior to receiving authorization from the Prescribing Provider, if such authorization was even sought at all.

126.    At times, Prescribing Providers issued prescriptions for Fraudulent Pharmaceuticals – which were ultimately dispensed and billed by the Pharmacy Defendants – on a date when it appears neither the Prescribing Provider, nor anyone associated with them, examined the patient. For example:

(i)     Insured JA was allegedly involved in a motor vehicle accident on December 13, 2018. Thereafter, he sought treatment at a No-Fault Clinic located at 4310 Church Avenue, Brooklyn, New York (the "4310 Church Avenue Clinic"). On November 27, 2019 AVK dispensed Baclofen, Oxycodone HCL, Meloxicam, Lidocaine 5% Ointment and Diclofenac 3% Gel to JA pursuant to a prescription ordered by Dr. Davy on November 27, 2019. There is no evidence JA treated with Dr. Davy on November 27, 2019.

(ii)    Insured ME was allegedly involved in a motor vehicle accident on June 23, 2019. Thereafter, she sought treatment at a No-Fault Clinic located at 46 W Suffolk Avenue, Central Islip, New York (the "West Suffolk Avenue Clinic"). On December 12, 2019 AVK dispensed Meloxicam, Lidocaine 5% Ointment, and Diclofenac Gel 3% pursuant to a prescription ordered by Dr. Davy on December 11, 2019. There is no evidence ME treated with Dr. Davy on December 11, 2019.

(iii)    Insured RS was allegedly involved in a motor vehicle accident on November 8, 2019. Thereafter he sought treatment at the West Suffolk Avenue Clinic. On March 3, 2020 AVK dispensed Diclofenac Gel 3% and Lidocaine 5% Ointment pursuant to a prescription ordered by Dr. Davy on February 29, 2020. There is no evidence RS treated with Dr. Davy on February 29, 2020.

(iv)    Insured PT was allegedly involved in a motor vehicle accident on July 23, 2019. Thereafter he sought treatment at the West Suffolk Avenue Clinic. On July 7, 2020 AVK dispensed Diclofenac Gel 3% and Lidocaine 5% Ointment pursuant to a prescription ordered by Dr. Davy on June 18, 2020. There is no evidence PT treated with Dr. Davy on June 18, 2020.

(v)    Insured MCC was allegedly involved in a motor vehicle accident on November 2, 2019. Thereafter he sought treatment at the West Suffolk Avenue Clinic. On December 12, 2019 AVK dispensed Baclofen, Meloxicam, Lidocaine 5% Ointment, and Diclofenac Gel 3% pursuant to a prescription ordered by Dr. Davy on December 11, 2019. There is no evidence MCC treated with Dr. Davy on December 11, 2019.

(vi)    Insured CN was allegedly involved in a motor vehicle accident on July 17, 2020. Thereafter, she sought treatment at the 4310 Church Avenue Clinic. On August 18, 2020 Avonora dispensed Lidothol 4.5-5% Film and Diclofenac Gel 3% to CN pursuant to a prescription ordered by Dr. Davy on July 30, 2020. There is no evidence CN treated with Dr. Davy on July 30, 2020.

(vii)    Insured IJ was allegedly involved in a motor vehicle accident on January 25, 2019. Thereafter, he sought treatment at the Hempstead Avenue Clinic. On October 24, 2019 Avonora dispensed Cyclobenzaprine and Acetaminophen to IJ pursuant to a prescription ordered by PA Dajdea. There is no evidence IJ treated with PA Dajdea on October 24, 2019.

(viii)    Insured NL was allegedly involved in a motor vehicle accident on November 3, 2021. Thereafter she sought treatment at a No-Fault Clinic located at 175-20 Hillside Avenue, 2nd Floor, Jamaica, New York (the "Hillside Avenue Clinic"). On January 6, 2022 Avonora dispensed Lidothol 4.5-5% Film to NL pursuant to a prescription ordered by Ataul Chowdhury, MD ("Dr. Chowdhury"). There is no evidence NL treated with Dr. Chowdhury on December 2, 2021.

127.    Notably, Dr. Chowdhury previously stated under oath that his signature was misappropriated and used to, among other things, sign prescriptions without his knowledge which were submitted to GEICO in support of billing for No-Fault benefits.

### c.   The Fraudulent Lidocaine Ointment Prescriptions

128.   The Pharmacy Defendants also routinely billed GEICO for exorbitantly priced Lidocaine 5% Ointment, pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

129.   The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Lidocaine 5% Ointment because the Defendants could readily buy Lidocaine 5% Ointment at low cost but bill GEICO and other New York No-Fault insurers through the Pharmacy Defendants for huge sums based on egregiously high wholesale prices.

130.   Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

131.   Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams. However, the Prescribing Providers virtually never indicated the maximum dosage on any prescriptions.

132.   The Prescribing Providers virtually never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

133.   Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison

sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

134.    Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% at a fraction of the cost.

135.    Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

136.    Yet the Prescribing Providers never recommended Insureds first try commonly available commercial Lidocaine products to treat their patients' minor aches and pains which they sustained in fender-bender type motor vehicle accidents, instead repeatedly prescribing Lidocaine 5% Ointment and directing the prescriptions to the Pharmacy Defendants, which billed GEICO as much as $2,605.80 for a single tube.

137.    In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

138.    Lidocaine 5% Ointment was routinely prescribed at the time of the initial examination during the acute stages of the Insureds' pain symptoms (before Insureds even had an opportunity to first try readily available, low-cost, over the counter Lidocaine products or oral pain

medication) and, at times, contemporaneous to oral NSAIDs, muscle relaxers and/or other Fraudulent Topical Pain Products such as Diclofenac Sodium Gel 3%. For example:

(i) On December 3, 2019, Insured DE was allegedly involved in a motor vehicle accident. That same day DE underwent an initial examination New York Medical Treatments, PC ("NY Med") at a No-Fault Clinic located at Hempstead Avenue Clinic. On December 3, 2019 Avonora dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen to this Insured pursuant to a prescription from Dr. Jacobi ordered on December 3, 2019 - the same day as the accident.

(ii) On February 11, 2020, Insured DNF was allegedly involved in a motor vehicle accident. The next day DNF underwent an initial examination with NYC Med at the Hempstead Avenue Clinic. On February 12, 2020 Avonora dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen to this Insured pursuant to a prescription from Dr. Jacobi ordered on February 12, 2020, one day after the accident.

(iii) On January 26, 2020, Insured PW was allegedly involved in a motor vehicle accident. The next day PW underwent an initial examination with NY Med at the Hempstead Avenue Clinic. On January 27, 2020 Avonora dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen to this Insured pursuant to a prescription from Dr. Jacobi ordered on January 27, 2020, one day after the accident.

(iv) On March 15, 2020, Insured DC was allegedly involved in a motor vehicle accident. The next day DC underwent an initial examination with NY Med at the Hempstead Avenue Clinic. On March 17, 2020 Avonora dispensed Lidocaine 5% Ointment and Naproxen to this Insured pursuant to a prescription from Dr. Jacobi ordered on March 16, 2020, one day after the accident.

(v) On February 10, 2020, Insured EC was allegedly involved in a motor vehicle accident. On February 12, 2020 EC underwent an initial examination with NY Med at the Hempstead Avenue Clinic. On February 12, 2020 Avonora dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen to this Insured pursuant to a prescription from Dr. Jacobi ordered on February 12, 2020, two days after the accident.

(vi) On May 15, 2020, Insured CB was allegedly involved in a motor vehicle accident. On May 19, 2020 CB underwent an initial examination with LR Medical at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Suite 2A, Brooklyn, New York (the "Coney Island Avenue Clinic"). That same day AVK dispensed Lidocaine 5% Ointment and Diclofenac Gel 3%

pursuant to a prescription from PA Paritskaya ordered on May 19, 2020, four days after the accident.

(vii)   On April 2, 2020, Insured NV was allegedly involved in a motor vehicle accident. On April 8, 2020 NV underwent an initial examination with LR Medical at the Coney Island Avenue Clinic. That same day AVK dispensed Lidocaine 5% Ointment, Diclofenac Gel 3%, Tizanidine, and Acetaminophen pursuant to a prescription from PA Paritskaya ordered on April 8, 2020, six days after the accident.

(viii)  On September 8, 2020, Insured EB was allegedly involved in a motor vehicle accident. On September 10, 2020 EB underwent an initial examination with Sudha Patel, MD ("Dr. Patel") at Sudha Patel, MD PLLC (the "Patel PLLC"). On September 14, 2020 AVK dispensed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine pursuant to a prescription from Dr. Patel ordered on September 10, two days after the accident.

(ix)    On November 1, 2020, Insured MR was allegedly involved in a motor vehicle accident. On November 4, 2020 MR underwent an initial examination with Dr. Pak at Pak Hong Sik MD Medical Care, PC On November 9, 2020 AVK dispensed Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a prescription from Dr. Pak ordered on November 4, 2020, three days after the accident.

(x)     On June 23, 2020, Insured GL was allegedly involved in a motor vehicle accident. On June 30, 2020 GL underwent an initial examination with M. Cristin Perdue, MD ("Dr. Perdue") at Metropolitan Medical and Surgical, PC ("Metropolitan Med"). On June 30, 2020 AVK dispensed Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine pursuant to a prescription from Dr. Perdue ordered on June 30, 2020, seven days after the accident.

139.    The Lidocaine 5% Ointment was prescribed pursuant to collusive arrangements and predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA approved medications with proven therapeutic effects available over-the-counter at a fraction of the cost.

140.    There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of Lidocaine 5% Ointment to Insureds, particularly given the availability of over-the-counter medications, as well as the lack of indication for use for the Insureds.

141.    There is no legitimate medical reason why the Pharmacy Defendants repeatedly dispensed Lidocaine 5% Ointment to Insureds, particularly given the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

142.    The Pharmacy Defendants typically billed GEICO between $$1,045.64 and $2,605.80 for a single tube of Lidocaine 5% Ointment and, to-date, have submitted over $675,000.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

143.    The Defendants' egregious billing coupled with the fact that the Prescribing Providers often failed to properly document the Insureds' need for or use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for the Pharmacy Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

### d.      The Fraudulent Topical Diclofenac Gel Prescriptions

144.    In addition to the egregious number of Lidocaine 5% Ointment prescriptions dispensed by the Defendants, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced Diclofenac Sodium Gel 3% ("Topical Diclofenac"), pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

145.    The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could

readily buy Topical Diclofenac at low cost but have the Pharmacy Defendants bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

146.    Topical Diclofenac is an NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

147.    Topical Diclofenac does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

148.    Moreover, some clinical studies of topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

149.    The Prescribing Providers routinely prescribed, and the Defendants routinely dispensed, Topical Diclofenac even though none of the Insureds suffered from actinic keratoses, treatment of which is the only FDA approved use of Diclofenac Sodium Gel 3%.

150.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating the potential for serious cardiovascular and gastrointestinal risks.

151.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

152.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac

sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

153.   Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of or simultaneously prescribed oral NSAIDs –  such as celecoxib, meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products such as Lidocaine 5% Ointment.

154.   Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

155.   Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Topical Diclofenac) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

156.   Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

157.   Nevertheless, at times the Prescribing Providers consciously prescribed, and the Defendants consciously dispensed, Topical Diclofenac in conjunction with oral NSAIDs and/or

Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

158.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with concurrent administration of diclofenac sodium.

159.    The Topical Diclofenac was prescribed and dispensed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

160.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

161.    In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers rarely addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

162.     The Pharmacy Defendants typically billed GEICO between $948.57 and $2,364.00 for a single tube of Diclofenac Sodium Gel 3% and, to-date, has billed GEICO approximately $800,000.00 for Diclofenac Sodium Gel 3%.

e.     **The Fraudulent Prescription Practices Regarding Other Fraudulent Pharmaceuticals**

163.     At times, the Prescribing Providers prescribed, and the Pharmacy Defendants dispensed, the Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

164.     In accordance with best practices, a prescription for a seven-to-ten-day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers often prescribed, and the Defendants dispensed, between a twenty and sixty-day supply of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury. For example:

(i)     Insured SM was allegedly involved in a motor vehicle accident on July 20, 2020. Thereafter, SM sought treatment with Quazi R Medical Services, PC ("Quazi R Med") at a No-Fault Clinic located at 92-08 Liberty Avenue, Ozone Park, New York (the "Liberty Avenue Clinic") and underwent an examination with Quazi Rahman, MD ("Dr. Rahman"). On June 10, 2021 Dr. Rahman issued a prescription for Naproxen, Lidocaine 5% Ointment, and Cyclobenzaprine, nearly eleven months post-accident. On June 30, 2021 Avonora dispensed Naproxen, Lidocaine 5% Ointment, and Cyclobenzaprine to SM pursuant to the prescription from Dr. Rahman.

(ii)     Insured IJ was allegedly involved in a motor vehicle accident on January 25, 2019. Thereafter, IJ sought treatment with Epione Medical, PC ("Epione") at the Hempstead Avenue Clinic and underwent an examination with PA Dajdea. On October 24, 2019 PA Dajdea issued prescriptions for Acetaminophen Extra Strength and a thirty day supply of Cyclobenzaprine, nearly ten months post-accident. On October 24, 2019 Avonora dispensed Acetaminophen Extra Strength and Cyclobenzaprine to this Insured pursuant to the prescription from PA Dajdea. Notably, there is no evidence IJ was treated by PA Dajdea on October 24, 2019.

(iii)   Insured TT was allegedly involved in a motor vehicle accident on March 8, 2019. Thereafter, TT sought treatment with Epione Medical at the Hempstead Avenue Clinic and underwent an examination with PA Dajdea. On October 3, 2019 PA Dajdea issued prescriptions for Meloxicam and a twenty-one day supply of Cyclobenzaprine, nearly seven months post-accident. On October 3, 2019 Avonora dispensed Meloxicam and Cyclobenzaprine to this Insured pursuant to the prescription from PA Dajdea.

(iv)   Insured CM was allegedly involved in a motor vehicle accident on November 12, 2019. Thereafter, CM sought treatment with NYC Med at the Hempstead Avenue Clinic and underwent an examination with Dr. Jacobi. On May 21, 2020 Dr. Jacobi issued a prescription for a thirty day supply of Cyclobenzaprine, over six months post-accident. On June 1, 2020 Avonora dispensed Cyclobenzaprine to this insured pursuant to the prescription from Dr. Jacobi.

(v)   Insured TR was allegedly involved in a motor vehicle accident on February 20, 2019. Thereafter TR sought treatment with Epione at the Hempstead Avenue Clinic and underwent an examination with PA Dajdea.  On August 29, 2019 PA Dajdea issued prescriptions for a twenty-one day supply of Cyclobenzaprine, more than six months post-accident. On September 1, 2019 Avonora dispensed Cyclobenzaprine to this Insured pursuant to the prescription from PA Dajdea.

(vi)   Insured SF was allegedly involved in a motor vehicle accident on May 17, 2019. Thereafter SF sought treatment with Metropolitan Med at a No-Fault Clinic located at 2076 East 13th Street, Brooklyn, NY (the "East 13th Street Clinic") and underwent an examination with Dr. Perdue. On May 3, 2021 Dr. Perdue issued prescriptions for Lidocaine 5% Ointment, Meloxicam, and a twenty day supply of Cyclobenzaprine, nearly two years post-accident. On May 10, 2021 AVK dispensed Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Perdue.

(vii)   Insured VK was allegedly involved in a motor vehicle accident on April 22, 2018. Thereafter, VK sought treatment with LR Medical at the Coney Island Avenue Clinic and underwent an examination with PA Paritskaya. On November 12, 2019 PA Paritskaya issued prescriptions for Gabapentin and a thirty day supply of Cyclobenzaprine, nearly one year and seven months post-accident. On November 20, 2019 AVK dispensed Gabapentin and Cyclobenzaprine to this Insured pursuant to the prescriptions from PA Paritskaya.

(viii)   Insured DA was allegedly involved in a motor vehicle accident on September 10, 2019. Thereafter, DA sought treatment with LR Medical at

the Coney Island Avenue Clinic and underwent an examination with Dr. Reyfman. On March 22, 2021 PA Paritskaya issued prescriptions for Tylenol Extended Release, Diclofenac Gel 3%, and a 30 day supply of Cyclobenzaprine, nearly one year and seven months post-accident. On March 31, 2021 AVK dispensed Tylenol Extended Release, Diclofenac Gel 3%, and Cyclobenzaprine to this Insured pursuant to the prescriptions from PA Paritskaya.

(ix)     Insured GB was allegedly involved in a motor vehicle accident on November 15, 2019. Thereafter, GB sought treatment with New York Spine Institute located at 761 Merrick Avenue, Westbury, New York (the "Merrick Avenue Clinic") and underwent an examination with Alexandre De Moura, MD ("Dr. De Moura"). On May 14, 2021 Jung Sung Choi, PA ("PA Choi") issued a prescription for Gabapentin and a sixty day supply of Cyclobenzaprine, approximately a year and a half post-accident. On May 14, 2021 AVK dispensed Gabapentin and Cyclobenzaprine to this insured pursuant to the prescriptions from PA Choi.

(x)      Insured CH was allegedly involved in a motor vehicle accident on October 3, 2018. Thereafter CH sought treatment with LR Medical at the Coney Island Avenue Clinic and underwent an examination with Dr. Reyfman. On March 2, 2020 PA Paritskaya issued prescriptions for Diclofenac Potassium Tablets, Diclofenac Gel 3%, Lidocaine 5% Ointment, and a 30 day supply of Cyclobenzaprine, approximately a year and five months post-accident. On March 4, 2020 AVK dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, and Cyclobenzaprine to this insured pursuant to the prescriptions from PA Paritskaya.

165.    In further keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, at times the Pharmacy Defendants dispensed multiple Fraudulent Topical Pain Products to the same Insured on the same date. For example,

(i)      Insured RH was allegedly involved in a motor vehicle accident on December 14, 2019. Thereafter she sought treatment with LR Medical at the Coney Island Avenue Clinic. On June 15, 2020 AVK dispensed Lidocaine 5% Ointment and Diclofenac Gel 3% to RH pursuant to prescriptions from Dr. Reyfman ordered on June 15, 2020.

(ii)     Insured OH was allegedly involved in a motor vehicle accident on September 26, 2019. Thereafter she sought treatment with LR Medical at

the Coney Island Avenue Clinic. On December 10, 2019 AVK dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, and Diclofenac Potassium Oral Tablets to OH pursuant to prescriptions from Dr. Reyfman ordered on November 27, 2019. Moreover, the simultaneous prescription of Diclofenac Gel 3% and Diclofenac Potassium Oral Tablets constitutes therapeutic duplication.

(iii)    Insured EK was allegedly involved in a motor vehicle accident on January 28, 2020. Thereafter he sought treatment with LR Medical at the Coney Island Avenue Clinic. On June 17, 2020 AVK dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, and Tizanidine to EK pursuant to prescriptions from Dr. Reyfman ordered on June 17, 2020.

(iv)    Insured PS was allegedly involved in a motor vehicle accident on February 14, 2020. Thereafter he sought treatment with LR Medical at the Coney Island Avenue Clinic. On May 13, 2020 AVK dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, MAPAP Arthritis Oral Tablets, and Tizanidine to PS pursuant to prescriptions from PA Paritskaya ordered on May 12, 2020.

(v)    Insured JV was involved in a motor vehicle accident on December 27, 2019. Thereafter he sought treatment with LR Medical at the Coney Island Avenue Clinic. On April 8, 2020 AVK dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, and Tizanidine to JV pursuant to prescriptions from PA Paritskaya ordered on April 8, 2020.

**B.    The Illegal, Collusive Arrangements Among the Defendants, Prescribing Providers and Clinic Controllers**

166.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

167.    New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7). In fact, New York Education Law § 6811(7) makes such agreements criminal.

168.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to the Pharmacy Defendants so that the Defendants could bill GEICO huge sums.

169.    In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols designed to exploit the patients for financial gain.

170.    The Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed not based on medical evidence but rather as a matter of course and without any recommendation that patients first try over-the-counter products; and the Fraudulent Topical Pain Products were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

171.    The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made it so the Insureds did not have the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to the Pharmacy Defendants, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves resided in counties other Queens and Brooklyn, New York, where Avonora and AVK

were located and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients' residences.

172.    The Defendants, Prescribing Providers and Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by the Pharmacy Defendants and that the Defendants benefitted financially from the prescriptions.

173.    Rather, the Fraudulent Pharmaceuticals were dispensed by the Pharmacy Defendants directly from the front desk staff at the various No-Fault Clinics or, alternatively, were automatically delivered to the Insured's homes.

174.    Tot the extent the Fraudulent Pharmaceuticals were delivered to the Insured's homes, the Pharmacy Defendants often made no effort to promptly deliver the Fraudulent Pharmaceuticals and instead purportedly delivered them weeks after the medications were prescribed.  For example:

(i)    Insured TK received a prescription for Lidothol 4.5-5% Film dated December 2, 2021 which was purportedly delivered by Avonora more than a month later on January 5, 2022.

(ii)    Insured JB received a prescription for Lidocaine 4.5% and Menthol 5% Patch dated October 5, 2021 which was purportedly delivered by Avonora more than three weeks later on October 27, 2021.

(iii)    Insured NL received a prescription for Lidothol 4.5-5% Film dated December 2, 2021 which was purportedly delivered by Avonora more than a month later on January 6, 2022.

(iv)    Insured ZK received a prescription for Lidothol 4.5-5% Film dated December 2, 2021 which was purportedly delivered by Avonora more than a month later January 5, 2022.

(v)    Insured AG received a prescription for Cyclobenzaprine, Lidocaine 5% Ointment, and Naproxen dated November 4, 2020 which was purportedly delivered by AVK almost four weeks later on November 30, 2020.

(vi)    Insured KR received a prescription for Diclofenac Gel 3% dated February 9, 2021 which was purportedly delivered by AVK three weeks later on March 1, 2021.

(vii)    Insured GM received a prescription for Diclofenac Sodium Gel 3% dated October 16, 2020 which was purportedly delivered by AVK more than two and a half months later January 1, 2021.

(viii)    Insured RG received a prescription for Cyclobenzaprine and Lidocaine 5% Ointment dated November 20, 2020 that was purportedly delivered by AVK more than a month later on December 24, 2020.

(ix)    Insured TC received a prescription for Cyclobenzaprine and Lidocaine 5% Ointment on December 9, 2020 that was purportedly delivered by AVK almost one month later on January 6, 2021.

175.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients and, accordingly, the Pharmacy Defendants often never bothered to deliver the products in a timely fashion because of that.

176.    The Prescribing Providers and Clinic Controllers also had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants rather than the multitude of other pharmacies that were equally capable of dispensing the prescriptions and were often more convenient to many of the patients.

177.    The Defendants, Prescribing Providers and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and, in many instances forging or altering prescriptions, and then directing those prescriptions to the Pharmacy Defendants, unless they profited from their participation in the illegal scheme.

178.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to the Pharmacy Defendants.

179.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the method of payment of kickbacks and the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

180.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacy Defendants.

181.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**C.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

182.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

183.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

184.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through Avonora and AVK thereby maximizing their profits.

185.    In support of their charges, the Defendants typically submitted: (i) a copy of the purported prescription most commonly in the form of the Prescribing Providers' prescription form, a printout of an electronic prescription, or a printout of a purported prescription record; (ii) a "No-Fault" form, known as an NF-3 Form, or a HCFA 1500 Claim Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) a "Billing Statement" which included the Insureds' demographics, dates the prescription was purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Prescribing Provider; (iv) a delivery receipt or "Pick Up Record"; and (v) the executed assignment of benefits form ("AOB") assigning the Insureds' benefits to the Pharmacy Defendants.

186.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

187.    In fact, the Pharmacy Defendants and Pharmacy Owner Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

188.    The Pharmacy Defendants and Pharmacy Owner Defendants paid only a fraction of the "average wholesale price" for the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with the Pharmacy Defendants' billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

189.    Further, upon information and belief, the Pharmacy Defendants and Pharmacy Owner Defendants often did not actually purchase topical pain products under the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

**D.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

190.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of the Pharmacy Defendants seeking payment for pharmaceuticals for which the Pharmacy Defendants are ineligible to receive.

191.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

(x)     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

(xi)    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to the Pharmacy Defendants for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

(xii)   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that

they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and forged prescriptions; and

(xiii)   The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

### E.       The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

192.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

193.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

194.   Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies; and (iii) many of the prescriptions were forged or unauthorized.

195.   The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics to reduce the amount of billing based on any single licensee.

196.     The billing and supporting documentation submitted by the Defendants seeking reimbursement for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

197.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation or arbitration proceedings against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacy Defendants have been engaged in fraud.

198.     The Defendants' continued collection efforts through numerous, separate collection proceedings is an essential part of their fraudulent scheme because they know it is impractical for an arbitrator or a civil court judge, in a single proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

199.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

200.     The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $568,300,000.00 representing payments made by GEICO based upon the fraudulent charges submitted through the Pharmacy Defendants.

201.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

203.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1.2 million in pending fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Avonora and AVK.

204.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants billed for pharmaceutical products that were medical unnecessary, prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care based on medical evidence.

205.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants in exchange for unlawful kickbacks and other financial incentives.

206.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and

continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants pursuant to the illegal, invalid, and forged prescriptions.

207.　　The Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacy Defendants dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

208.　　The Defendants, including the Pharmacy Defendants, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

209.　　Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Pharmacy Defendants have no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELEIF
### Against S. Aronov, I. Aronova and John Doe Defendants "1' – "10"
### (Violation of 18 U.S.C. § 1962(c))

210.　　GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

211.　　Avonora and AVK constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

212.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Avonora and AVK ostensibly are independent entities – with different names and tax identification numbers – that were created and/or operated as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers. The Pharmacy Enterprise has operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

213.    The Pharmacy Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO), by preparing and filing applications and documents in order to obtain licenses and registrations necessary to operate as pharmacies in New York State, by creating and maintaining patient files and other records, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by selecting and purchasing the targeted Fraudulent Pharmaceuticals from wholesalers, by coordinating the fraudulent scheme with various Prescriber Providers and Clinic Controllers operating at multiple No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent

Pharmaceuticals  to them to dispense to Insureds, by facilitating payments stemming from the illegal kickback arrangements, engaging in large-scale check cashing and money laundering, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

214.    S. Aronov, I. Aronova, and John Doe Defendants "1" – "10" were employed by and/or associated with the Pharmacy Enterprise and knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for nearly three and half years seeking payments that the Pharmacy Defendants were not eligible to receive under the No-Fault Laws because: (i) the billed-for services under the names of Avonora and AVK were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Avonora and AVK in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services under the names of Avonora and AVK were the product of illegal, invalid and forged prescriptions.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity

identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

215.    The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges.  The predicate acts of mail fraud are the regular way in which the Pharmacy Owner Defendants and John Doe Defendants "1" – "10" operated the Pharmacy Enterprise and acts of mail fraud therefore are essential for the Pharmacy Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, including the submission of claims under multiple TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Pharmacy Owner Defendants and John Doe Defendants "1" – "10" continue to attempt collection on the fraudulent billing submitted through the Pharmacy Defendants to the present day.

216.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

217.    GEICO has been injured in their business and property by reason of the above-described conduct in that they have paid at least $568,300.00 pursuant to the fraudulent bills submitted in furtherance of the Pharmacy Enterprise.

218.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against S. Aronov and John Doe Defendants "1" – "10"**
**Violation of RICO, 18 U.S.C. § 1962(c)**

219.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

220.    Avonora is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

221.    S. Aronov knowingly has conducted and/or participated, directly or indirectly, in the conduct of Avonora's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges for no less than four years seeking payments that Avonora was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Avonora in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid and forged prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

222.    Avonora's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Aronov operated Avonora, inasmuch as Avonora was never eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Avonora to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Avonora to the present day.

223.    Avonora is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Avonora in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

224.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $273,600.00 pursuant to the fraudulent bills submitted by the Defendants.

225.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against I. Aronova and John Doe Defendants "1" – "10"**
**Violation of RICO, 18 U.S.C. § 1962(c))**

226.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

227.    AVK is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

228.    I. Aronova knowingly has conducted and/or participated, directly or indirectly, in the conduct of AVK's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges no less than four years seeking payments that AVK was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to AVK in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid and forged prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

229.    AVK's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which I. Aronova operated AVK, inasmuch as AVK was never eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for AVK to

function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through AVK to the present day.

230.    AVK is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by AVK in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

231.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $294,700.00 pursuant to the fraudulent bills submitted by the Defendants.

232.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
**Against S. Aronov and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

233.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

234.    Avonora is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

235.    S. Aronov and John Doe Nos. "1" through "5" are employed by or associated with the Avonora enterprise.

236.     S. Aronov and John Doe Nos. "1" through "5" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Avonora's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Avonora was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Avonora in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

237.     S. Aronov and John Doe Nos. "1" through "5" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

238.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $273,600.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Avonora.

239.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE SIXTH CLAIM FOR RELIEF
### Against I. Aronova and John Doe Nos. "1" through "5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

240.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

241.    AVK is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

242.    I. Aronova and John Doe Nos. "1" through "5" are employed by or associated with the AVK enterprise.

243.    I. Aronova and John Doe Nos. "1" through "5" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of AVK's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that AVK was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for pharmaceuticals were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing

Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to AVK in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

244.    I. Aronova and John Doe Nos. "1" through "5" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

245.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $294,700.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through AVK.

246.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THE SEVENTH CLAIM FOR RELIEF
**Against S. Aronov, Avonora, and John Doe Defendants "1" – "10"**
**(Common Law Fraud)**

247.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

248.    S. Aronov, Avonora, and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Avonora.

249.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care based on medical evidence; (ii) in every claim, the representation that Avonora was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact S. Aronov, Avonora, and John Doe Defendants "1" – "10"  participated in illegal, collusive relationships in which S. Aronov, Avonora, and John Doe Defendants "1" – "10"  steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Avonora in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Avonora was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal and invalid prescriptions; and (iv) in every claim, the representation that Avonora was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact S. Aronov, Avonora, and John Doe Defendants "1" – "10"  intentionally targeted a specific

set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

250.    S. Aronov, Avonora, and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Avonora that were not compensable under the No-Fault Laws.

251.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $273,600.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by S. Aronov, Avonora, and John Doe Defendants "1" – "10" through Avonora.

252.    The extensive fraudulent conduct of S. Aronov, Avonora, and John Doe Defendants "1" – "10" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

253.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE EIGHTH CLAIM FOR RELIEF
**Against I. Aronova, AVK, and John Doe Defendants "1" – "10"**
**(Common Law Fraud)**

254.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

255.    I. Aronova, AVK, and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of AVK.

256.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care based on medical evidence; (ii) in every claim, the representation that AVK was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact I. Aronova, AVK, and John Doe Defendants "1" – "10" participated in illegal, collusive relationships in which I. Aronova, AVK, and John Doe Defendants "1" – "10" steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to AVK in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that AVK was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal and invalid prescriptions; and (iv) in every claim, the representation that AVK was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact I. Aronova, AVK, and John Doe Defendants "1" – "10" intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

257.    I. Aronova, AVK, and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through AVK that were not compensable under the No-Fault Laws.

258.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $294,700.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by I. Aronova, AVK, and John Doe Defendants "1" – "10" through AVK.

259.    The extensive fraudulent conduct of I. Aronova, AVK, and John Doe Defendants "1" – "10" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

260.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE NINTH CLAIM FOR RELIEF
### Against S. Aronov, Avonora, and John Doe Defendants "1" – "10"
### (Unjust Enrichment)

261.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

262.    As set forth above, S. Aronov, Avonora, and John Doe Defendants "1" - "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

263.    When GEICO paid the bills and charges submitted by or on behalf of Avonora for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments

based on S. Aronov, Avonora, and John Doe Defendants "1" - "10"' improper, unlawful, and/or unjust acts.

264.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that S. Aronov, Avonora, and John Doe Defendants "1" - "10" voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

265.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

266.    By reason of the above, S. Aronov, Avonora, and John Doe Defendants "1" - "10" have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $273,600.00.

**THE TENTH CLAIM FOR RELIEF**
**Against I. Aronova, AVK, and John Doe Defendants "1" – "10"**
**(Unjust Enrichment)**

267.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

268.    As set forth above, I. Aronova, AVK, and John Doe Defendants "1" - "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

269.    When GEICO paid the bills and charges submitted by or on behalf of AVK for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on I. Aronova, AVK, and John Doe Defendants "1" - "10"' improper, unlawful, and/or unjust acts.

270.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that I. Aronova, AVK, and John Doe Defendants "1" - "10" voluntarily

accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

271.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

272.    By reason of the above, I. Aronova, AVK, and John Doe Defendants "1" - "10" have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $294,700.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Avonora and AVK have no right to receive payment for any pending bills, amounting to approximately $1.1 million in charges submitted to GEICO;

B.      On the Second Claim for Relief against S. Aronov, I. Aronova, and John Doe Defendants "1" – "10" compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $568,300.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper

C.      On the Third Claim for Relief against S. Aronov and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $273,600.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.     On the Fourth Claim for Relief against I. Aronova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $294,700.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Claim for Relief against S. Aronov and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $273,600.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Claim for Relief against I. Aronova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $294,700.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Claim for Relief against S. Aronov, Avonora, and John Doe Defendants "1" – "10", a recovery in favor of GEICO in an amount to be determined at trial but approximately $273,600.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Claim for Relief against I. Aronova, AVK, and John Doe Defendants "1" – "10", a recovery in favor of GEICO in an amount to be determined at trial but approximately $294,700.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Claim for Relief against all the S. Aronov, Avonora, and John Doe Defendants "1" – "10", a recovery in favor of GEICO in an amount to be determined at trial but approximately $273,600.00, together with punitive damages;

J.      On the Tenth Claim for Relief against all the I. Aronova, AVK, and John Doe Defendants "1" – "10", a recovery in favor of GEICO in an amount to be determined at trial but approximately $294,700.00, together with punitive damages.

Dated: Uniondale, New York
       May 5, 2023

RIVKIN RADLER LLP

By:    /s/ *Michael A. Sirignano, Esq.*
       Michael A. Sirignano (MS 5263)
       Barry I. Levy (BL 2190)
       Priscilla D. Kam (PK 1505)
       Joanna B. Rosenblatt (JR 3359)
926 RXR Plaza
Uniondale, New York 11556