# Exhibit "F"

Exhibit "1"

## AFFIDAVIT OF ATAUL HAKIM CHOWDHURY, M.D.

STATE OF NEW YORK     )
                      : ss.
COUNTY OF nASSAU      )

Ataul Hakim Chowdhury, M.D., being duly sworn, deposes and states that the following is true subject to the penalties of perjury.

1. I have personal knowledge of the statements made in this affidavit and would testify as to them in a court of law if called upon to do so.

2. I give this affidavit voluntarily and had the opportunity to consult with my own personal counsel concerning its preparation and execution.

3. This affidavit summarizes my association with a multidisciplinary medical clinic located at 3910 Church Avenue, Brooklyn, New York 11203 (the "Church Ave Clinic") and my knowledge concerning its operations, the professional corporations that operated therefrom, including NYC Community Medical Care, P.C. ("NYC Community Medical"), the various individuals and entities associated with the Church Ave Clinic, and the prescriptions issued in my name to patients from the Church Ave Clinic. This affidavit is not intended to be an exhaustive account of my experiences.

4. I attended Dhaka Medical College in Dhaka, Bangladesh and graduated in April 1993 with a Bachelor of Medicine and Surgery. I immigrated to the United States in 1996 where I continued my studies as a graduate student in Master of Public Health programs at Tulane University and the University of Southern Mississippi before studying at the Kaplan Educational Institute in New York. From 1999 to 2000 I was an intern at St. Barnabas Hospital, Bronx, New York, and in 2002 I completed my residency in internal medicine at St. Barnabas Hospital.

Following completion of my residency, I became licensed to practice medicine in Minnesota and worked there as an internist at the Austin Medical Center from 2002 to 2006. Thereafter, I became licensed to practice medicine in Arizona, and from 2006 to 2009 I worked as an attending physician at various hospitals in Phoenix, Arizona. In 2010, I became licensed to practice medicine in New York, and from 2010 through 2014, I worked as an attending physician at South Nassau Hospital in Oceanside, New York. In December 2013, I stopped working at South Nassau Hospital fulltime and continued to practice general medicine in the State of New York through my private practice – NYC Community Medical. I continued as a per diem hospitalist at South Nassau Hospital until 2017 and now work solely as a private practitioner.

5. In or around March or April of 2017, I was approached by Nazmul "Tinku" Nayeem a/k/a Neel ("Nayeem") – whom I met while attending Dhaka Medical College – regarding an opportunity to treat patients involved in automobile accidents at various clinics that treat only no-fault patients, including the Church Ave Clinic. According to Nayeem, I would come to the Church Ave Clinic once a week to supervise Moshtaq Ahmed, P.A. ("Ahmed"), who was already associated with the Church Ave Clinic but would now be an employee of my previously formed professional corporation, NYC Community Medical. My sole duties and responsibilities would be to supervise Ahmed, review patients' medical charts, and sign-off on initial and follow-up examinations performed by Ahmed. All medical services would be rendered by Ahmed and billed under NYC Community Medical. In exchange, I was told that I would be entitled to the profits generated through NYC Community Medical after various expenses were paid, including rent and Ahmed's salary.

6. NYC Community Medical began operating at the Church Ave Clinic in June or July of 2017. I personally examined a few patients when NYC Community Medical first began

14

operating at the Church Ave Clinic, but from August 2017 until I ended by association with the clinic in July 2018, all healthcare services performed at the Church Ave Clinic through NYC Community Medical were performed by Ahmed.

7.  Although Nayeem is a specialist assistant specializing in orthopedics, to my knowledge he did not treat patients or perform any healthcare services at the Church Ave Clinic. Rather Nayeem, together with a non-medical professional named Raheem "Robert" Khan ("Robert"), served as manager of the clinic overseeing the operations of the Church Ave Clinic, and the professional corporations that operated therefrom. Nayeem and Robert both worked for "Ivar" – an unlicensed layperson who was the primary owner of the Church Ave Clinic and the professional corporations that operated therefrom. Robert was present every day and oversaw the daily oversight and management of the Church Ave Clinic's operations, while Nayeem was at the clinic regularly and oversaw the general operation of the Church Ave Clinic such as recruiting various healthcare professionals and their respective professional corporations to work and operate at the clinic. Though I know both Robert and Nayeem worked for Ivar, Ivar was only present at the clinic on rare occasions.

8.  In the fall of 2017, about three to four months after I became involved with the Church Ave Clinic, I began to grow suspicious of Nayeem and Robert, and the way they operated the Church Ave Clinic. I expressed my concern to Nayeem and Robert, including the fact that although I was the owner of NYC Community Medical, in actuality my involvement was limited and I had no knowledge of NYC Community Medical's day-to-day operations at the Church Ave Clinic and no active role in the treatment and care of NYC Community Medical's patients. These concerns were heightened by the fact that Nayeem and Robert repeatedly told me not to document or express my concerns in writing, but rather to only address them in person. I was also concerned

about the manner in which patients were brought to the Church Ave Clinic for treatment and learned that, to a large extent, patients are referred to the clinic by a select few personal injury lawyers and by individuals who I believe are paid to bring patients to the clinic. However, I was repeatedly assured by Nayeem, Robert and their attorneys that it was a legitimate operation. As I had no experience with no-fault laws and regulations or with treating patients under no-fault insurance policies, I trusted Nayeem and Robert and continued my involvement with them and the Church Ave Clinic.

9. The longer I remained involved with Nayeem, Robert and the Church Ave Clinic, the more concerned I became regarding the legitimacy of its operations. For example, it was Nayeem who ensured that the lease agreements between the landlords and professional corporations recruited to operate at the Church Ave Clinic were executed, and who designated both the billing companies that would perform the professional corporations' billing and collections services as well as the collections attorneys that would pursue the professional corporations' unpaid no-fault claims. Nayeem decided what company would handle the billing for NYC Community Medical and which law firm would handle the collections for NYC Community Medical. It is my understanding that all the professional corporations that operated from the Church Ave Clinic were required to use the billing company and collections attorneys chosen by Nayeem.

10. Nayeem also had access to NYC Community Medical's corporate checking account at Santander Bank and would often ask me to sign checks which were used to issue payments to various persons and entities. In fact, other than a few checks written out to me, almost all the checks written from NYC Community Medical's bank account were written by someone other than myself. I am unaware of who the persons and entities that received checks from NYC

Community Medical are, or what services they were being paid for. NYC Community Medical's checking account was also used to cover various expenses at the Church Ave Clinic, and to pay various individuals who I believed to be employed by Nayeem and Robert rather than by me or NYC Community Medical. In fact, I never interviewed, hired, or fired any of NYC Community Medical's employees. Furthermore, Nayeem would issue checks from NYC Community Medical's bank accounts to various entities he owned in order to funnel money to himself or to fund his other businesses such as his garment import business. I even came to learn that Nayeem visited my local Santander Bank branch and represented himself as me. During my approximate one-year involvement with Nayeem, Robert and the Church Ave Clinic, Nayeem withdrew 80-90% of the money in NYC Community Medical's account. I was never aware of any details relating to the financial operation of NYC Community Medical, including the revenue and/or expenses of the professional corporation.

11. I also learned that Nayeem and Robert made a stamp of my signature, without my knowledge or consent, and would use this stamp to sign checks, again without my knowledge or consent. When this came to my attention in or about August 2017, I immediately advised Nayeem that no one was to use a stamp of my signature. Nayeem stated this was not a problem so long as I came to his clinics once a week on a set schedule to sign reports, however, I later learned that Nayeem and Robert continued to use my stamped signature without my knowledge or consent, both on checks as well as medical reports, referrals and prescriptions.

12. For example, even though I told Nayeem that I needed to personally sign all reports and review them in person with Ahmed, I learned that my stamped signature was being used on medical examination reports performed by Ahmed and never reviewed by me. Many of these medical reports referred patients for trigger point injections which were then performed by Ahmed.

My stamped signature was then placed on the operative reports for the trigger point injections. In the 27 years that I have been practicing medicine, I have never performed a trigger point injection on any of my patients. When I became aware that Ahmed was doing so under my name, I made it clear that such services should only be rendered in limited circumstances and only after he discussed the patient's history with me, yet I came to learn that Ahmed was performing an excessive number of trigger point injections on a regular basis and that Nayeem and Robert were using my stamped signature on the reports.

13. Nayeem and Robert also submitted billing to GEICO through NYC Community Medical for "Outcome Assessment Testing" and submitted billing to GEICO for medical examinations, trigger point injections, and Outcome Assessment Testing through my personal tax identification number – again, all without my knowledge or consent. I did not become aware of this until I was served with and reviewed the summons and complaint in the matter of Government Employees Insurance Co., et al v. East Flatbush Medical, P.C. et al, 1:20-cv-01695 (MKB)(PK). Notably, prior to receiving the summons and complaint in GEICO v. East Flatbush Medical, I had never heard of "Outcome Assessment Testing" nor ever performed such testing on any of my patients. Furthermore, although I provided Nayeem with my personal tax identification number to potentially open another professional corporation, I never authorized Nayeem or Robert to submit any billing for healthcare services under my personal tax identification number.

14. I also learned that my stamped signature was being used to refer patients for an excessive number of MRIs without my knowledge or consent, and without me first reviewing the patients' medical records to determine whether MRIs were medically necessary. I advised Nayeem, Robert, and Ahmed that patients were only to be referred for MRIs in limited circumstances. Nevertheless, I later learned that Nayeem and Robert continued to use my stamped

18

signature to refer patients for an excessive number of MRIs. I recently had the opportunity to review a representative sample of MRI referrals allegedly authorized by me, which are attached hereto as Exhibit "A." The sample includes referral forms for Sky Radiology, P.C. ("Sky Radiology") and Citimedical I, PLLC, which also goes by the name of CitiMed Diagnostics ("CitiMed"), that contain requests for MRIs and a stamp of my signature. Some of referral forms indicate that the MRI would occur at "Soul Radiology". These referral forms were submitted to GEICO with bills seeking reimbursement for diagnostic imaging. I can attest that the attached MRI referrals, which contain a stamp of my signature, were not authorized by me and I never determined whether the MRI referrals were medically necessary. I can also attest that all other MRI referrals containing a stamp of my signature, whether to Sky Radiology, CitiMed, Soul Radiology, or any other radiology facility were never authorized by me and submitted without my determination that the referrals were medically necessary.

15. My stamped signature was also used to prescribe DME without my knowledge or consent, and again without me first reviewing the patients' medical records to determine whether such DME was medically necessary. I was completely unaware that my stamped signature was being used on prescriptions for DME until I was served with a summons and complaint in the matter of Government Employees Insurance Co., et al v. Longevity Medical Supply, Inc. et al, 1:20-cv-01681 (RPK)(VMS). Recently, I had the opportunity to review a representative sample of DME prescriptions that were alleged authorized by me and submitted to GEICO, which are attached hereto as Exhibit "B". The DME prescriptions contained a stamp of my signature on check-list forms that were provided to multiple DME suppliers, including Longevity Medical Supply, Inc. ("Longevity"), Enterprise Health Products, Inc. ("Enterprise"), Ezra Supply Inc. ("Ezra"), RVS Supply Corp. ("RVS"), and Medigna Inc. ("Medigna"), which were submitted to

GEICO in support of charges for DME. I can attest that the DME prescriptions within Exhibit "B" contained a stamp of my signature, were not authorized by me, and I never determined whether the DME prescriptions were medically necessary. I can also attest that all other prescriptions for DME containing a stamp of my signature, whether provided to Longevity, Enterprise, Ezra, RVS, Medigna, or any other DME supplier were never authorized by me and submitted without my determination that the referrals were medically necessary. Notably, I can confirm that I have never issued, or authorized the use of my signature to issue, a prescription for DME to a no-fault insurance patient.

16. It also came to my attention that Nayeem, or someone associated with his no-fault clinic located at 1894 Eastchester Avenue, Bronx, New York has issued electronic prescriptions for various topical pharmaceutical products under my name to patients whom I never authorized prescriptions for and whom I never even examined. A sample of these prescriptions are annexed hereto at Exhibit "C".

17. Finally, after my continued attempts to resolve my concerns about my and NYC Community Medical's involvement at the Church Ave Clinic went ignored and unaddressed by Robert and Nayeem, I advised Nayeem that I was too busy with my private practice in the Bronx and that due to my inability to be involved with NYC Community Medical's operations at the Church Ave Clinic, I was permanently ending my and NYC Community Medical's involvement in no-fault and with the Church Ave Clinic effective July 15, 2018.

18. Based on information that I have more recently reviewed I believe that Nayeem and Robert ceased submitting billing to GEICO under NYC Community Medical on August 30, 2018 and ceased submitting billing under my personal tax identification number on July 20, 2018. However, Nayeem and Robert continue to pursue collection of the receivables for both NYC

Community Medical and my personal tax identification number through arbitration and litigation.

I have no involvement in these collections efforts.

                                                                   Ataul Hakim Chowdhury, M.D.

Sworn to before me this
13th day of November, 2020

_____
Notary Public

**VIRGINIA M. WIELGUS**
Notary Public, State of New York
No. 01WI5062723
Qualified in Nassau County
Commission Expires July 8, 20 22

21